17050.   MATHIS, administratrix, *v.* WESTERN & ATLANTIC RAILROAD.

In the trial of this action, brought under the Federal employer's liability act, to recover for the death of an alleged servant of the defendant railroad company, the evidence failed as a matter of law to establish the relation of master and servant as set forth in the petition. The court therefore committed no error in granting a nonsuit.

DECIDED JULY 20, 1926. ADHERED TO ON REHEARING OCTOBER 2, 1926.

Action for damages; from Cobb superior court—Judge Blair. November 11, 1925.

*J. E. Mozley, Harwell, Fairman & Barrett,* for plaintiff.

*Tye, Peeples & Tye, Morris, Hawkins & Wallace,* for defendant.

BELL, J. The administratrix of the estate of Clyde Otis Mathis, deceased, brought suit under the Federal employer's liability act against the Western & Atlantic Railroad, to recover for his death, alleged to have been caused by the negligence of the defendant's agents and servants, the petition averring that at the time decedent was injured he was an employee of the defendant railroad, and that both he and the defendant were engaged in interstate commerce. The trial resulted in a nonsuit, and the case is here upon exceptions by the plaintiff to review that judgment. Irrespective of other questions, we think the nonsuit was right, because the evidence failed as a matter of law to establish the relation of master and servant. The evidence showed that the decedent, at the time of receiving the injury which resulted in his death, was working as a substitute for one Boseman and at Boseman's instance, at Kennesaw, a station on the defendant's line of railroad in Cobb county, Georgia. The defendant's agent at this station was Ray Baldwin. Besides the agent, the defendant employed there two or three other men, including Boseman. On the day of the decedent's death, Boseman, for some reason not disclosed, desired to go to Atlanta, and had arranged with Mathis to take his place at the station. According to the petition, Mathis met his death under the following circumstances: he had left the station for the purpose of delivering orders to the defendant's servants in charge of an approaching train, "having in his hand a hoop-like device to which was attached the orders, which hoop-like device was to be handed up and caught upon the arm of the engineman and conductor." As he neared the track for the purpose of delivering the orders he was attacked "with a spell of epilepsy and staggered and fell upon the track," and the train ran over his body and killed him. One of the duties of Boseman was to deliver train orders, as Mathis was attempting to do at the time of his death.

On the question whether Mathis was a servant of the railroad, it is enough to examine a portion of the testimony of Boseman, as

follows: "I went to work in January, 1923. Mr. Baldwin, the agent, employed me. I made application to Mr. Baldwin for work, by word of mouth. . . As to whether I recall the day that Clyde Mathis was killed at Kennesaw, I went down that morning to the depot. . . As to my seeing Clyde Otis Mathis there that morning, he might have been there when I went down there, but anyhow I called him and he was there, and I told him I would turn things over to him, and I went home to dress to get ready to go to Atlanta. As to my saying anything to Mr. Baldwin about Clyde Mathis that morning, I told him he was going to work for me. He told me it was all right. Mr. Baldwin he was there before I went home to dress. I left Clyde Otis Mathis in my place. I mentioned to Mr. Baldwin the day before this date about getting off. I did not say about who I was going to put in my place. I asked him who to get, and he said to get anybody who could do the work. Clyde Otis Mathis had worked in my place before, a time or two, a short while—two or three hours. The same Mr. Baldwin was the depot agent then. Mr. Baldwin knew about him working there when he worked before. . . As to whether or not I left anybody in my place that day but Clyde Mathis, my father after the accident happened. On that day, that morning when I left there, I left Clyde there. As to when I first made application when I went to work there, I asked the agent if I could get a job there. The agent saw me; he asked would I take the job. I did not go to work the day I had the conversation with Mr. Baldwin. It was three or four days before I went to work. The agent did not tell me that he would have to submit it to the superintendent or general manager, and get authority. He told me he would have to submit it, and he would recommend me. Yes, the other boy wanted a leave of absence of 30 days; he was going to Atlanta to try out a job, and see if he liked that; and he said they would not give him leave of absence. And he asked me if I would take the job. As to whether he told me he would recommend me and they would take his recommendation, no, sir, he didn't say anything like that. I do not remember him telling me anything about getting authority and sending it in to employ me. I didn't tell you in your office this morning that I first went to the agent, Mr. Baldwin, and discussed it with him, and he told me he would have to send it in, and get authority, and whoever he rec-

ommended they would employ. I did tell you that since I got
the job, it had to go through the superintendent, and any one he
recommended was hardly ever turned down. I was working at a
salary of so much per month," paid by the railroad company.
"Now at any time that I got this deceased, Clyde Mathis, or any
one else, to relieve me there, I paid them myself for doing that
work. And at any other time that Clyde had worked a little
while for me the railroad didn't pay him. I paid him out of my
pay-check. I hired him and paid him, to take my place and
do my work. And that's what I did on this particular day that
he was killed; hired him and told him I would pay him out of my
pay-check for this work. I told him I would pay him; nothing
was said about the agent; whatever he charged I would pay him.
And it was on that agreement between me and him that this
deceased was working there that day. I stated I got my father
to finish out the work that afternoon. I paid him. And if I
got my brother or any one to take my place at any other time, or
my father, I always paid whoever took my place. I made the ar-
rangements to work in my place, and paid them out of my pay;
they were working for me at that time. I went down to the depot
that morning I spoke of, and Clyde wasn't there. I swept the
depot, as it was my duty to do so; and then after I had cleaned
up and got things straight there, Clyde Mathis, under his agree-
ment with me, came down there to relieve me and to finish my
day's work while I went somewhere else, with the agreement be-
tween me and him that I would pay him for it. . . Well, a
part of the time I left there, there wasn't anything to be done, he
was just there in case anything came up. As to whether or not
I got Mr. Baldwin's consent on this occasion for Clyde Mathis to
work for me, he said any one I could get to do the work, and I
got Clyde. He knew I had Clyde and he didn't object. As to
why did I get his permission, well, I wouldn't be off without ask-
ing him. On other occasions, when Clyde Mathis substituted for
me as to whether or not I got Mr. Baldwin's consent for him to
substitute for me, it was always all right, any one that could do
the work for me to put there. I say it was always all right with
Mr. Baldwin if I got somebody that could do the work, if I paid
them for it; that was all right with Mr. Baldwin. As to whether
I mean to state when I got Clyde Mathis at other times to work

a little while at the time I went to Mr. Baldwin and saw him about it, it was all right as I understood it if I got somebody that could do the work. I always asked him about being off, sometimes I would ask him who to get in my place, and he would say anybody that could do the work. It was always understood I paid for it. Of course the agent wasn't going to pay for it. I do not know whether Mr. Baldwin had any authority to hire and employ on that railroad or not." There was some testimony by Boseman and others that on the morning of the particular substitution, Mathis was seen sweeping the station platform, but it is clear that he was doing so under the instant arrangement with Boseman, and any inferences favorable to the plaintiff which might otherwise be drawn from the fact of such labor on the defendant's premises will be controlled by the legitimate deductions from the testimony touching the facts and circumstances surrounding such arrangement. There was no testimony by Boseman or any other witness which could add materially to that of Boseman as quoted above.

The burden was on the plaintiff to prove that the relation of master and servant existed between the decedent and the railroad company on the occasion in question. The plaintiff insists (among other things) that since the evidence shows that the arrangement between Boseman and Mathis was made with the knowledge of Baldwin, the station agent, Mathis became in law a servant of the company, entitled to the same protection as the regular servant for whom he was substituting. This is to treat Baldwin as having the authority to consent to the arrangement on behalf of the company. This he could not have done in the absence of authority to employ labor. There is nothing in the evidence to show that any such authority had been conferred upon him by the railroad company, or that his duties were of such scope that the authority could be implied. If it had appeared that he employed Boseman, whom the company had undoubtedly treated as its servant, then it might have been inferred that he was empowered to employ Mathis. But Boseman's testimony that Baldwin *had not stated* certain things with reference to "getting authority," and as to the strength of Baldwin's recommendations to the company, and that he, the witness, *had not made* certain extrajudicial statements to the attorney conducting the cross-examination, was entirely consistent with the positive and unequivocal testimony of

this witness to the effect that, when he was negotiating for the position, Baldwin told him, "that he would have to submit it and would recommend" him. This evidence was in regard to the res gestæ, and explained what actually occurred between Baldwin and Boseman. The evidence as a whole failed, as a matter of law, to show that Boseman's contract of employment was made with the company through its agent Baldwin. See, in this connection, *Evans* v. *Scofield Co.,* 120 *Ga.* 961 (48 S. E. 358).

The general scope of Baldwin's duties are not shown, and only a few men were employed at the station. Besides this, we know merely that he was station agent and was an operator.

"The general effect of the decisions concerning employees whose functions relate to a circumscribed sphere of operations which place them for certain purposes in control of a small number of persons may be said to be that no presumption will be entertained of their possession of authority to hire subordinates, and that the questions whether their authority, supposing it to be conceded and established, was sufficiently extensive to enable them to bind their principals by the contract in question, are to be determined from the specific evidence introduced." 1 Labatt's Master & Servant (2d ed.), 404. The authority to employ other servants for the company to perform such important duties as were required of Boseman could not be inferred from the mere fact that Baldwin was the agent in charge of the office. *Southern Railway Co.* v. *Duke,* 16 *Ga. App.* 673 (85 S. E. 974). In the case of *Payne* v. *Rivers,* 28 *Ga. App.* 28 (3) (110 S. E. 45), this court held that where a person is employed by a servant as his temporary substitute, with the express or implied knowledge of the master, or with the master's subsequent ratification, he is to be considered as a servant for the time being, to the same extent as would be the person for whom he is substituting. But in that case it appeared not only that the substitution was made with the knowledge of the station agent, but that he had authority to employ other servants about the station. Hence that case is distinguishable from the case now under consideration. Notice to Baldwin was not notice to the master, except when it related to matters within the scope of his employment. In the absence of evidence, either direct or

circumstantial, to show that Baldwin would have been authorized himself to employ Mathis, it could not be said that the company would be affected by his knowledge of the arrangement between Boseman and Mathis. *Collins* v. *Crews*, 3 *Ga. App.* 238 (4) (59 S. E. 727). If the evidence had shown a custom or practice of Boseman or other employees to substitute other persons in his place or their places, of such long standing that the knowledge and consent of the company might have been inferred, a question of fact would have been presented as to whether the substitute, in the particular instance, should be treated as the company's servant. See *Haluptzok* v. Great Northern R. Co., 55 Minn. 446 (56 N. W. 144, 26 L. R. A. 739). But·it does not appear that Boseman had ever obtained any substitute, excepting "a time or two, a short while—two or three hours," prior to the transaction under investigation. This could not be taken as evidence of a practice or custom continued for so long a time that the company probably knew of it. It is true, there is some suggestion in Boseman's testimony that he had on other occasions procured persons other than Mathis to take his place, but his testimony upon this point was hypothetical only. Anyway, there is nothing to indicate when, or how long prior to the occurrence immediately in question, any of the substitutions were made.

The station agent might, perhaps, have had the implied authority to employ additional help in an emergency rendering it necessary to do so to protect the company's interests. Hollidge v. Duncan, 199 Mass. 121 (85 N. E. 186, 17 L. R. A. (N. S.) 982); B. & O. Railroad Co. v. Burtch, 263 U. S. 540 (44 Sup. Ct. 165, 68 L. ed. 433). But no emergency appears in the present case. So far as the evidence discloses, Boseman was not sick or forced by any circumstance to leave his post of duty. The so-called "emergency authority" should be limited to situations of actual emergency, so as not to infringe the master's right to select such servants as he needs or chooses to employ. This right is an important one, involving, as it does, considerations relating to the character of the service required, the liability of the master for the servant's negligence, and certain liabilities to the servant himself. In the instant case the person substituted was unfortunately afflicted with a serious malady. The company might have desired to inquire into the condition of the health of a person whom it was

about to employ, and probably would not have engaged the services of one who was subject to spells of epilepsy. The circumstances appearing in the instant record illustrate the importance of the master's right to determine who shall become his servant.

"To create the relation of master and servant there must be some contract or some act on the part of one person which expressly or impliedly recognizes another as his servant." *Atlanta & West Point R. Co.* v. *West,* 121 *Ga.* 641 (49 S. E. 711, 67 L. R. A. 701, 104 Am. St. R. 179). "One who without any employment whatever, but at the request of a servant who has no authority to employ other servants, voluntarily undertakes to perform service for a master is" not a servant but "a mere volunteer." *Early* v. *Houser,* 28 *Ga. App.* 24 (2) (109 S. E. 914). See also, in this connection, *Cooper* v. *Lowery,* 4 *Ga. App.* 120 (60 S. E. 1015); *Central of Ga. Ry. Co.* v. *Mullins,* 7 *Ga. App.* 381 (66 S. E. 1028); *So. R. Co.* v. *Duke,* 16 *Ga. App.* 673 (85 S. E. 974); *Rhodes* v. *Ga. R. Co.,* 84 *Ga.* 320 (10 S. E. 922, 20 Am. St. R. 362). The case involves no question of ratification. Baldwin could not ratify that which he could not in the first place authorize. And it does not appear that Mathis ever did any service that was accepted by any one having authority from the company to ratify the arrangement under which he worked.

Irrespective of any question of estoppel (see *Gulf Refining Co.* v. *Harris,* 30 *Ga. App.* 240, 117 S. E. 274), the evidence in the record, in the absence of rebuttal, might perhaps be sufficient to authorize a finding of the master and servant relation between the defendant and Mathis, if the matter was in issue between the defendant and a third person, whose knowledge of the facts necessary to establish the relation would presumably be inferior to that of either of the parties to the contract creating it, if it existed. But in the present case the plaintiff administratrix is in no better position as to the shifting of the burden of evidence than her intestate would be had he merely been injured and were himself suing. The action being predicated upon the theory that the decedent was the defendant's servant, the plaintiff could not recover without showing the existence of the actual relation alleged, the plaintiff having the onus as to this issue. *Postell* v. *Brunswick &c. R. Co.,* 112 *Ga.* 602 (37 S. E. 869).

Moreover, to hold that the evidence would authorize a finding

that Mathis became a servant of the company would violate the principle of the law of agency that an agent ordinarily can not delegate his authority to another unless specially empowered to do so. Civil Code (1910), § 3571. Under the evidence, it does not appear that Baldwin ever undertook to employ Mathis as a servant of the company, the most that is shown by the evidence being that he consented for Boseman to employ any one that could do the work. Assuming, then, that the authority to employ, under given conditions, was conferred upon the station agent, Baldwin, he could not delegate this authority to the inferior agent, Boseman, since it involved discretion and judgment, the exercise of which the company might never have been willing to entrust to Boseman.

It would be an extreme hardship to hold the company liable as the master of a person employed by one acting with no other authority than that conferred by the company's station agent, who, even if himself authorized, was yet not empowered to delegate his authority to another.

The evidence failed to show that the decedent was the defendant's employee. The nonsuit was right, under the evidence, and the judgment should be affirmed.

*Judgment affirmed. Jenkins, P. J., concurs. Stephens, J., dissents.*